Ms. Hashimoto. Thank you, your honor, and may it please the court. Erica Hashimoto from the Georgetown Law Center on behalf of Mr. Currica. With the court's permission, Ashley Stewart, a third-year law student, will present the argument on behalf of Mr. Currica. Thank you. Stewart. Good morning. May it please the court. Mr. Currica entered his guilty plea without knowing that he faced 90 years in prison. This happened because no one affirmatively told Mr. Currica the relationship between the sentencing guidelines and the statutory maximum. The post-conviction relief court found that the sentencing judge made it clear to Mr. Currica that the guidelines are advisory only. That finding is years rather than 30 to 51 years. He would not have pleaded guilty. The PCR court's decision and Mr. Currica does have a plea agreement. Mr. Currica would be facing the statutory maximum of 90 years, but it needs to be made clear to Mr. Currica that the sentencing guidelines were mentioned at the plea colloquy. I just want to be clear on the point. If without a plea agreement, he walks in the court, he's convicted, what the most he would face from your perspective would be 90 years? Didn't the state dismiss some charges against him? It wouldn't those be years? It could be more than 90 years if it's the same if they did not decide to lower the charges. It seems without, not just the labor, but without that plea agreement, he's going to face first-degree murder. That would be life without parole. So if we set aside this agreement, he could be convicted and face life without parole. Correct? Not necessarily if the state allows him to replead. I understand the conditional aspect of it that the state could allow him to do it, but this evidence, well maybe when I see a case like this, I'm thinking, well this must be a particularly hard case to prove. In other words, that must be something that gives the state great incentive to want to do a plea agreement on this case. I don't know if this case fits in that category, at least in terms of the evidence that seems to be there. I don't know the full case, but if it is a case that the state could prove, why wouldn't it just say, okay, we'll set it aside, we'll try this case and argue for life without parole, which he certainly could get. Not certainly, but it's a possibility, I should say. Don't you agree? Just examining in terms of what you're asking for. Sometimes you can ask for a remedy or something and it may not, the ultimate result may be worse than what you had before you asked for the remedy. And I certainly hope that doesn't happen here, but the possibility does exist. I wanted at least to start with that as a framework before we proceed. You do agree with that? Yes, that possibility does exist. He fully understands that? Yes. And I think out of efficiency, everyone wanted to enter the plea agreement. But the issue here is that Mr. Creca had no idea what that plea agreement actually meant. Well, he did know some things, right? He knew because the court, the PCR court found that he knew that he wasn't promised a guideline sentence. Do you agree with that? The PCR court found that the sentencing judge made it clear to Mr. Creca that the guidelines are advisory only and that he knew what he was pleading guilty to. And we find that is unsupported by the record. I didn't ask that. I asked whether or not the PCR court made a finding that your client wasn't promised a guideline sentence. Is that right? Yes. But under the Boykin and Brady analysis, that does not affirmatively show. I understand. But let me just, so here's what else I think the PCR court found, and you tell me if you disagree, that the plea court ensured that Creca understood his That is what the PCR court found that he understood the maximum penalties. And then the last thing he found was that he made a subjective finding of credibility with respect to your client, that he simply didn't believe him when he said he thought that he would be subject, that he would be sentenced according to the guidelines. That's entitled to some deference, right? That stems from its factual finding that the sentencing court made it clear to Mr. Creca that the guidelines are advisory only. So you disagree with that? You don't think that's correct? It's unsupported by the record. Yes, I disagree. All right. And the standard is an objective one. It's whether the record affirmatively shows that Mr. Creca was told his maximum sentencing exposure. And so as you read this transcript, it's not a model of clarity. I'll grant you that. But with respect to the three charges that Mr. Creca pled guilty to, I mean, if you read the transcript as a whole, it seems fairly clear that the judge told him, it's up to me to decide what the sentence is in the context of the maximum sentence for each of each of these charges. I mean, that's how I read this transcript. And isn't that enough? It should be based on what a reasonable person in Mr. Creca's position. Before I, I'm sorry to interrupt you, but particularly in the context of an Aetba claim, we have to be, I mean, no fair minded jurist could come to a conclusion as to the reasonableness of the PCR court's finding. Given that standard in particular, it seems like a pretty difficult road to hoe here. The PCR court found that the sentencing judge made it clear to Mr. Creca that the guidelines are advisory only. And that is the only finding that supports its conclusion. And the credibility of determination does not support its conclusion either, because everything in the record, not just the plea colloquy transcript, but the letters, the plea agreement, and the plea memorandum are ultimately, were too confusing for someone in Mr. Creca's position to understand his sentence. Ms. Stewart, you agree you're not making an ineffective assistance counsel claim here today, right? Correct. All right. So let's just agree on the facts. The facts start with a contract, correct? That's what the plea agreement, yes. Case law clearly says we treat these agreements as contracts. Do you agree that in this contract, it did not say what his sentence would be? Correct. Okay. And he pled guilty and they did their part. They dropped the other brothers, you know, a bunch of counts, and then he pled to the three. Do you agree that he was told that the maximum sentence for each was 30 years? 30 for one, 30 for the second, 30 for the third. You agree with that? Yes, that was in the transcript. But what was also there was the sentencing guidelines. Okay. But let's agree on what we can agree on. So we agree with that. So now let's get to the guidelines. Guidelines were there, and I agree with you. The government gave the wrong guidelines to his counsel. It appears so. Yeah. Gave the wrong guidelines. But those were guidelines. Now tell me then, what is it that was breached by the government in that scenario when he got 85 years? The breach is ultimately up to the court to, it's their obligation to make it clear what Mrika's sentence is. But if there was any place in the record that said the guidelines are advisory, it's just to a lay person, guidelines don't necessarily tell you that they are advisory or that they don't impact your sentence. Well, he had a lawyer. And there's no place in the record that the lawyer told him the relationship between the guidelines and the statutory maximum. Why wouldn't we just take the word guidelines and mean just what it says, guidelines? It's a guide. Historically, guidelines... It's not required, at least in the Maryland law, it's advisory. So why would it not be the case? But to maybe where Judge Gregory started out and said this is not an ineffective assistance of counsel. To what extent does a defense counsel have an obligation to explain that this is not mandatory or this is just advisory? I mean, if it comes in and you have this contract relation, contractual relationship represented by counsel, what? I mean, does the counsel just hear this and don't whisper to the client that these are just guidelines and they're not advisable or they just let it go? And if we do that, why would we ever say he has to advise anything? The best thing for a defense counsel to be would don't explain a thing in the world that you hear in that courtroom, because if you do, then you would be knowing of something. But if I tell you, then you wouldn't know. You wouldn't know. So why wouldn't we, let's say, if we're going to say we're going to... I think we ought to look at counsels, except that they're going to be competent, unless it's something that... Why wouldn't we think a competent counsel explained this to you? I completely agree that a competent counsel should explain the difference between statutory maximum and sentencing guidelines range. And Boykin and Brady specifically emphasize the court's obligation in explaining that as well on the record. And so the issue here is no one affirmably told Mr. Kreeca, and I think his actions following his sentencing demonstrate that as well. As soon as the state mentioned a higher guidelines range at sentencing, his defense counsel did say, this is not what the parties agreed to. And Mr. Kreeca walked into his plea colloquy thinking that the parties had agreed to 30 to 51 years. And so that must be his sentence. And it was never made clear otherwise that he could receive 90 years. And brief references to the statutory maximum are simply not enough. And there are several cases that explain that when there are two sentencing ranges or numbers on the record, and it's never explicitly explained what sentence applies or what impact those sentences have. And it was objectively unreasonable to return to Judge Diaz's question about epidefference and how to go over that standard. The PCR court's decision is ultimately unsupported by the record, and it unreasonably applied Boykin by discounting some of the record evidence. The five mentions of the sentencing guidelines at each turn when the statutory maximum was mentioned made it confusing and muddled for Mr. Kreeca to understand his sentence. And Boykin requires that the court, I'll quote this because this is important, the utmost solicitude, particularly in cases when the stakes are this high. Mr. Kreeca is serving an 85-year sentence currently, and he entered his plea agreement thinking that he would receive 30 to 51 years. And there is no reasonable assurance from the record that he was told 90 rather than 51 years. And that is what we are looking for, the reasonable assurance, some affirmative information in the record that shows an explanation to Mr. Kreeca, a layperson, that the guidelines had no impact on his sentence. Boykin was an extreme case where the judge said nothing to the defendant about his plea. And I understand that something more is needed than that, but is it fair to say that a defendant needs to understand each and every factor that goes into a sentence when deciding whether or not a plea was voluntary? Because I said earlier, this is not, I'll spot you that this is not a model of clarity when it comes to the advisory sentencing guidelines. But we have a lot more here than we had in Boykin, right? Yes. And I think the cases that apply Boykin afterwards, for example, there is a case in the Second Circuit, Hanson v. Phillips, which is very similar to this case in which the court recognizes Boykin's principle and says that we're looking for something affirmative in the record that explains the sentence. Is that a habeas case? Yes. And there are several other cases, including Jameson v. Klim in the Third Circuit, that it's clear that the Boykin's principle has been discussed several times since then, even if there's a plea colloquy transcript that this court can review, unlike Boykin. So I asked you this earlier, and I think Judge Gregory was getting at this too. When the judge told the defendant, here's the maximum sentence for each of these counts, and I can sentence you to whatever sentence I want, it's entirely up to me, wouldn't a reasonable defendant at that point have an understanding that, wait a minute, it's not, there's a disconnect here. Even if he thought subjectively he was going to be sentenced according to the advisory guidelines, once he hears that from the judge, at that point, isn't he now correctly, been correctly informed? No. He said, I can impose whatever sentence depending on what I determine. And that could tell him about... exercise of discretion, subject to the maximum sentence for each count. It's not clear that that discretion is within the 30 to 51 year range, or 30 to 90, or above 90 at that point, because whatever sentence does not tell Mr. Tariqa what his actual sentence is. And that's why I think the case is focused on this affirmative language, because saying that I have no obligation is not necessarily an affirmative statement, saying that you can receive 90 years in prison, do you understand that? You didn't say that, I'll grant you that, but close enough for government work, I guess, is what your colleague over here is going to say. And unfortunately, the record at several times mentions the sentencing guidelines, and so that was never enough for Mr. Tariqa to understand, specifically someone saying whatever sentence, and depending on what I can determine, he already went in there thinking that he could receive 30 to 51 years. And so something affirmative, and direct, and consistent, and accurate needed to be said to make it clear to Mr. Tariqa what he was actually facing. And we ask that this court reverse and remand with instructions to grant Mr. Tariqa habeas relief. If there are no further questions, I will reserve the remainder of my time for rebuttal. Thank you, Mr. Stewart. Good morning, may it please the court. Andrew DiMasselli, Assistant Attorney General on behalf of Respondent Appley Warden Richard Miller. Judge Diaz, I would not say that it's good enough for government work, but perhaps good enough to satisfy the AEDPA standard. Maryland's sentencing guidelines are never binding on the state courts. Mr. Tariqa's written plea agreement said nothing about guidelines. Mr. Tariqa was never told that his sentence would be capped by the guidelines. And the plea court properly advised Mr. Tariqa that he could be sentenced up to 30 years on each count. Thus, Mr. Tariqa was sufficiently advised of the nature and consequences of his plea, and the post-conviction court's decision was not objectively unreasonable. The guidelines were part of the negotiations for the plea, were they not? They were, I would not characterize them as part of the negotiations. The parties certainly discussed them. They appear in the plea offer letter, they appear in the discussions, but they weren't part of the negotiations of the plea agreement, because of course they don't appear at all in the plea agreement. The only thing that appears in the plea agreement regarding the sentencing is that the state reserves the full right to allocute. Well, what are they then? Was it just surpluses? What's the purpose of the guidelines? And matter of fact, the government took the time to calculate them, although we found that they were wrong. And you put those in, they were in the papers. What was the purpose then for the guidelines? I think the guidelines are important for two reasons. One, to advise the court, to give the court a general baseline, but also it's a predictive tool. It provides the defendant sort of a baseline understanding of what the guidelines would recommend to the court, so that he can assess the quality of his plea agreement. Right. You said the key word is a predictive tool. And it factors in whether or not you want to roll the dice and plea guilty, doesn't it? Well, he did not accept a plea agreement that had a binding sentence. That's the critical aspect here. We don't have to worry about that. That's not before us. The one that is before us, he did accept. And my question then to you is, isn't that a part of the calculus you make in the risk? For example, the district court says, I can give you up to 90 years. But then you have these guidelines. And as you said, I couldn't say it better than you. The predictive aspect of that is, well, OK, you could give 90. But the guidelines, and lawyers know this, that's like the average range, it's all done, the commission and all those things, it's put together. It's not assured, but it goes into the thing. So isn't that sort of like a carrot on the stick? And then all of a sudden you say, wait a minute, oh, that changed. I don't think it's necessarily a carrot. Again, I mean, the question before the court, I think, is whether Mr. Carrico was properly advised of the nature and consequences of his plea. And he was never guaranteed a particular sentence within the guidelines range. And it's no different from- But was he lured into it, though? By your incorrect calculation of the predictive tool that assesses risk? I don't think that he was necessarily lured into it at all. Well, necessarily, that is luring someone. You said, guidelines are a lot lower. They're lower. The thing is, the judge can give you this, but the things that the judge will look at in terms of what the average people get is lower. Then all of a sudden, at the time, at the sentencing hearing, you said, time, oh, it's higher than that. Well, I mean, it's- 21 years higher, right, on the par end. That's true, that's true. But Mr. Carrico was always able to negotiate a plea agreement that had a guaranteed sentence within the guidelines, but that's not what he negotiated for. He negotiated for a plea that allowed him to escape life imprisonment for first-degree murder. And that certainly is probably the most important calculus in Mr. Carrico's decision. We don't know exactly what he discussed with his attorney, but the plea agreement- Well, we know that's not true now because, as Judge Wynn aptly asked the question of counsel, Ms. Stewart said, we understand that, and this is opposition. So it's not correct that he would do anything to avoid that harsher sentence because he's here today. And that's exactly what happened. And then when he goes back, the government likely would, whatever, but he would face it again. So we know that's not true because that's been borne out today. He's here with that risk. But he was told that the guidelines were lower than- Oh, no, they're high, they're 21. And then, that kind of thing. I mean, I don't really understand how, I guess, I'm a dinosaur. I used to practice criminal defense work. It was totally different. But, you know, you go in there and you plead guilty, and then you get 85 years. I mean, that's interesting. But I guess, and then you said you were going to allocute, right? You reserved that right to allocute? That's what the plea agreement said, that the state reserves the full right to allocute, which- What does that mean? Well, Mr. Carrico understood it to mean that they have the right to advocate, which I think is- Advocate for what? For the sentence that the state believes is appropriate. And that's precisely what the plea agreement contemplated. Did you tell his lawyer you're going to go in there and ask for maximum 90 years? I don't think that the record demonstrates exactly what Mr. Carrico's- Well, don't you think that would be fair? I mean, in other words, you're in a contract. You said, look, there are guidelines. There's a maximum. But I can tell you right now, when you plead guilty and we go there, we're going to ask for the max. Wouldn't that be fair? Well, I point the court to the plea colloquy at the hearing. That's what the- That's what Boykin requires, that there is something on the record to indicate that the defendant understood the nature and consequences of his plea. And in this case, the court who had a discussion with Mr. Carrico said that you are liable for a maximum penalty of 30 years in jail, depending on what I determine. And you can be placed on probation for any suspended sentence that I might impose. I'm entitled to impose a sentence that would include a component part or part of it that would be suspended. I'm not obligated to do that. So each of these charges carries the possibility of being put in jail for up to 30 years. Once again, I can impose whatever sentence, including jail time and a period of suspended jail time if I wish to do so. So that colloquy sufficiently advises Mr. Carrico that he is liable for up to 90 years. He is now on notice that his plea agreement does not bind the court to any particular sentence. That's what I, you know, maybe I'm not on the soapbox, but I just don't understand that. In the United States, we have the most protective, the most protective system in terms of people charged with crimes in the world. And we consider that to be a trademark of our Constitution. And the right to have counsel, the right to have a jury trial, the right to go and call witnesses, and all those things are very important. So when you're talking about plea agreements, that's really, I mean, the framers would say that's one of those things where you're going to go offline and eschew all of those rights that you have for this. But don't you think you want to make sure that there's no ambiguity as to what it would be, what you're giving up? It's almost like, see to me, you ought to tell them at the Rule 11 quality, listen, you give up all these rights, let me tell you, I can give you the maximum sentence. I don't care what your lawyer told you. I don't care what the guidelines say. You would be really silly to give them all up because that's what I can do to you. Wouldn't that be a fair way to, then you can say, on the record, right? Then we told the statute, you get things like, well, we gave them guidelines. And then we switched the guidelines right at the end. And then we did that. And then we asked for the maximum when we got there. I mean, is that the way we really think the framers meant that? You're giving up some precious things. Tell them the truth. Yes, I may give you, and very likely will, 90 years. You really want to give up all those rights? We don't do that because we wouldn't get that many pleas. Will we? Will we? There's a lot to unpack there. I don't come across telling you. We wouldn't get many, would we? I think that Mr. Carrico was sufficiently advised. You're not going to answer my question. No, I think that, as Judge Diaz put it, this record is not ideal. It's not a model of clarity. Certainly, I would wish that there was more time spent on this discussion. But the question, I think, before the court is whether, not only whether Mr. Carrico was sufficiently advised, but whether any reasonable court, whether any court could find beyond a possibility of fair-minded disagreement that he was sufficiently advised under the AEDPA standard. And certainly, Boykin and Brady require there has to be a record that Mr. Carrico, that the defendant understood the nature and consequences of his plea. But I don't think that the state post-conviction court's ruling was contrary to that precedent, nor was it an unreasonable application, as the district court found below. Again, certainly, we would prefer that there was more discussion on the record. But again, the post-conviction court explicitly told Mr. Carrico, I can impose whatever sentence up to 90 years, 30 years on each offense. That's what the court told Mr. Carrico. And at that point, that was the opportunity for Mr. Carrico to say, well, wait a minute, that's not what I expected. Wait a minute, that's not what counsel told me. Wait a minute, that's not what I want to do. But at the time, So here's what kind of challenges you as to why we're going in this direction. But it seems as a matter, if you were looking at it in terms of factual, it's not just a pie-in-the-sky argument that he didn't understand it. It seems to have been his counsel's belief that that's what it was. When he shows up with the pre-sentencing report and finds out it's 45 to 70 years, he then turns to the judge and says, Judge, our understanding is 30 to 51. We'd ask you to honor our understanding in sentencing him. That looks to me like that counsel also thought that this was within the guiding range of 30 to 51. And we only talk about the difference in the 30, 51 to the 45, 70, not the 30, 30, 30, and 90. There's some confusion here that's going on. And every court, when we sit in these appellate courts, we sometimes forget how different courts run. Some run more locally oriented with understanding. Others are a little bit more formal. We typically find those when you get into the bigger city type areas there. But sometimes there's a little country lawyering going on and understanding with the DA. Because you know you're going to be dealing with them a lot and you're going to deal with the judges. So you've got this plea agreement. First of all, you got it for first and second degree. I think that's a pretty good hit right there. Judge thought so. That's a big deal. Judge thought it could have been first degree. But it's that second. So that in and of itself has reduced the sentence to some extent for life without possibility of parole. But when you look at this case holistically, there's a troubling thought. What was the counsel thinking on this case? Because it really does appear as though this defendant here, oh, he's hearing, I mean, why even tell him if this can be 31 to 50, 51 years or 45 to 70 years, if he can be sentenced up to 90 years. Why not just say 90 years and then I got a feel. So I could if I want to, but I don't have to. You say that's what he said, but it's not that explicit. And I think what muddles it is when the counsel has represented here. Judge, he's arguing about this other guy's range. He's not arguing about the 90. He says, that's not our understanding to go up to 40 to 70. Our understanding is the lower lane, 30 to 51. Why is that not important? I think the critical factor there is that surely it's unfortunate that the parties miscalculated the guidelines. But despite the fact that defense counsel at the sentencing hearing argued that the court should honor the original calculation of 30 to 51. It could a plea agreement be made for the miscalculated length. In other words, could the DA make a plea agreement with the defendant of 30 to 51 years? Even if it can be calculated, the guidelines could that have been? Absolutely. I mean, it's our position. It's not a question of, you know, did you miscalculate it? The miscalculation doesn't matter if that's what you brought to the plea agreement and that's what you agreed to. Then if you later on, I mean, so like anything else, the government made a mistake. They should have looked at a different range. Well, I think your honor's critical language is brought to the plea agreement. It was never incorporated in the agreement. That's the critical problem here is that Mr. Kuroka is expecting a sentence within the guidelines, even though at no point was he ever promised a sentence in the guidelines. He, in fact, raised that his primary argument below was a Santabello claim, a breach of contract claim, which the courts readily rejected because there was no language in the plea agreement. There was no agreement at all whatsoever, which is why if the court were to vacate the plea agreement. You know, go more to what Judge Gregg was going on, but really probably as you begin to deal with these plea agreements, probably ought to focus on, from the defendant's perspective, probably the most important term in that agreement is how long am I going to be in prison? I mean, all the other stuff you put in there, whether it's first or second is a big deal, but why wouldn't you be more explicit on that? It seems to me even a trial judge is going to say, okay, this is the sentence you are subject to. We're not worried about a plea agreement or whatever, but you can be sentenced up that amount. That seems to be missing to some degree, but you say it's here implicitly because of the way, and I will admit the trial judge did go by the way, even bring up the 30-30 and say, you know, you can be sentenced anywhere along those lines. I mean, again, I think that this record is not ideal, and I would be much happier to have a different record, but the plea court's advisements sufficiently indicated to a reasonable person in Mr. Karika's shoes that he was liable for 30 years on each sentence, and that is sufficient to indicate to him the nature and consequences of his plea, and the fact that the court never told Mr. Karika that he could be sentenced and that he would be sentenced within the guidelines was sufficient. And I think on top of that, in addition to sort of the objective record, that's part of the reason why we argue that the post-conviction court did not believe Mr. Karika. Is there enough evidence to convict this defendant right now, in your opinion? If you set aside a plea and said, go back to trial on it, could you just try the case and convict him? I couldn't say for sure exactly all of the evidence they have, but I understand that there is a partial confession and DNA evidence. And co-defendants. And co-defendants as well. I don't know if they would testify against him or not. Of course, we haven't had a full trial on this issue, so I don't know all the evidence the state would have. But certainly, I mean, of course, the parties agree to a plea agreement in order to avoid sort of the uncertainties of trial and the uncertainties of, you know, or the certainty of, potential certainty of receiving a life sentence. I mean, I think that is a critical factor. But as you said, everything is back on the table. You can't go for first degree, you can go for all of that, right? I think that's correct, yes. I think that's correct. But to sort of back up, I think, you know, in addition to the objective record that we have, the post-conviction court explicitly rejected Mr. Karika's testimony. He testified that he believed that he was going to get a sentence within the guidelines range and that he did not understand that his potential exposure was 90 years. And the post-conviction court flatly rejected that and said that, you know, he knew precisely what he was going to plead guilty to. How do we deal with that credibility factor? I think that that is dispositive of his claims under EDPA. That the, it fundamentally undermines his claim, which is that I was, I misunderstood that my plea was not voluntary because I did not understand that I could get 90 years. Does the defendant challenge it in the open and brief? I'm sorry? Does the defendant challenge that finding of the PCR court in open and brief? Does the, does the PCR court challenge that? Does the defendant challenge it? I don't think, I raised it in our responding brief, that particular defense. So they would not necessarily have the opportunity to raise that in their opening brief. But, you know, ultimately, I think under the EDPA standard, this case really boils down to whether the post-conviction court's decision was objectively unreasonable. You know, whether it was so lacking in justification that there was an error well understood and comprehended in existing Supreme Court holdings beyond any possibility of fair-minded disagreement. And in this case, I think reasonable minds could disagree about whether Mr. Karika was sufficiently advised and whether he, in fact, knew of the potential sentencing exposure. Does the court have any other questions? Thank you for your time. We ask that the court confirm. Thank you, Mr. D. Sally. Stewart, you have some time reserved. Thank you. Picking up on the credibility finding, that stems from the PCR court's finding that the sentencing court made it clear to Mr. Karika that the guidelines are advisory only. That is unsupported by the record. And the PCR court found that Mr. Karika, quote, knew damn well what he was pleading guilty to. Nothing in the record suggests that. Also, it's an objective standard. It's whether Mr. Karika, someone in Mr. Karika's position would know that his sentence was 90 years, and that is not the case here. And I wanted to explain the case Austin v. Plumlee, which says that this court does not decision when it makes an unreasonable fact finding. And that is the case here. This court should be reviewing the case de novo. And to pick back up on Chief Judge Gregory's point, due process is definitely a trademark of the Constitution. And we are arguing that Mr. Karika is entitled to his due process rights. He should have known, meaning the court, the state, or his defense counsel should have clearly explained to him what his sentence was before he entered his plea. I think, you know, a few times we've looked at what happened at the sentencing portion of this. But again, Mr. Karika had already entered his plea before he got to sentencing. And so the guidelines changed later on, and he still didn't know what his sentence was at any point in the record. And the whatever sentence language that we discussed a lot was also discussing probation and a suspended sentence. It was too confusing for a person in Mr. Karika's position. He was a 22-year-old black man at the time who had learning disabilities and psychiatric conditions and several other things such as homelessness and drug abuse at the time. He could not have known that he was facing 90 years based on- Did the record indicate that the fact finding court acknowledged his learning disability, his homelessness, and those things? At sentencing, yes. No, no, I talked about it in terms of PCR, in terms of looking at the understanding of this plea agreement. There was none, was there? There was none. Just the expletive in terms of he knew, as you said, well, that's in the record, yeah. Correct. Go ahead. And I think it's important that we not focus on the benefit Mr. Karika could have received based on entering his plea agreement. What's required of due process is that the record firmly show he was told his maximum sentence and he was simply not. The word allocute in his plea agreement, that sounds like a legal term that a layperson should not be able to know. And if it is a term that they should know, Mr. Karika would think they could get any sentence between 30 to 51, that the state might allocute for 51, but it never suggests that he could receive 90. Liable is also a legal term within the plea colloquy, and it is not what a layperson can necessarily understand, especially after hearing several times the guidelines range. And just to be clear on what the record shows, the sentencing judge never said the word 90. He said 30, 30, 30, as Judge Wen pointed out. And so at no point at the plea colloquy did Mr. Karika believe he was going to get 90. The record is ultimately too opaque, and that's what makes it objectively unreasonable. And Hart v. Hanson, Hanson v. Phillips, and Jameson v. Klim found that as well. And if the court has no further questions, I will sit down. Thank you, counsel. I note that you're a court opponent. And on behalf of the Fourth Circuit, I want to thank you so much for being here. And it looks like the Hoyas were well represented today and created here. And thank you so much. We appreciate that. And also, of course, Mr. Demasele, your able representation of your client as well. We'll come down and greet counsel.
judges: Roger L. Gregory, James Andrew Wynn, Albert Diaz